**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 21-131-DLB-EBA**

**BRIAN TUCKER**                                                        **PLAINTIFF**


**v.**                          **MEMORANDUM OPINION AND ORDER**


**KENTUCKY FARM BUREAU**
**MUTUAL INSURANCE COMPANY, et al.**                      **DEFENDANTS**

* * * * * * * * * * *

**I.    INTRODUCTION**

This matter is before the Court upon Motions to Dismiss filed by Defendants Kentucky Farm Bureau Mutual Insurance Company ("Kentucky Farm Bureau"), Greene Light Fire Investigations, LLC ("Greene Light"), and Elmer Greene.  (Docs. # 19 and 20). The Motions to Dismiss have been fully briefed (Docs. # 28, 29, and 31), and thus stand ripe for the Court's review.   Additionally, other motions are pending on the docket, including previous Motions to Dismiss (Docs. # 16 and 17) which have been mooted by the filing of an Amended Complaint (Doc. # 18), and a Motion for Leave to File Excess Pages filed by Plaintiff Brian Tucker (Doc. # 27).  The Court has reviewed all pending motions and associated filings, and for the reasons stated herein, Defendants' Motions to Dismiss the Amended Complaint (Docs. # 19 and 20) are **granted**, the Motions to Dismiss the original Complaint (Docs. # 16 and 17) are **denied as moot**, and Mr. Tucker's Motion for Leave to File Excess Pages (Doc. # 27) is **granted.**

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In September 2021, Plaintiff Brian Tucker filed this action in Kenton Circuit Court, alleging civil violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), in addition to related claims under Kentucky state law, against Defendants Kentucky Farm Bureau, Greene Light, and Elmer Greene. (*See* Doc. # 1 ¶ 1). In October 2021, Kentucky Farm Bureau removed the action to this court under 28 U.S.C. § 1441(a), with the consent of Greene Light and Mr. Greene. (*Id.*). After removal and the filing of initial Motions to Dismiss, Mr. Tucker timely filed an Amended Complaint under Rule 15(a)(1)(B), and so the facts of the case will be relayed based on his Amended Complaint. (Doc. # 18).

In May 2016, Mr. Tucker left Northern Kentucky with Judy DeStefano, a friend, to spend time on vacation in Gatlinburg, Tennessee. (*Id.* ¶¶ 36-37). But before Mr. Tucker and Ms. DeStefano arrived in Gatlinburg, they became aware that Ms. DeStefano's house in Independence, Kentucky was on fire. (*Id.* ¶ 39). They immediately returned to Northern Kentucky and found that a fire had "consumed the structure and contents of [Ms. DeStefano's] residence." (*Id.* ¶ 38). After the fire was extinguished, local authorities investigated the fire's cause and noted a "pattern near a back door that possibly could [have] indicate[d] a liquid pour," but nonetheless listed "no human factors contributing to the ignition of the fire" on the final Incident Report by the fire department. (*Id.* ¶¶ 40-41).

At the time of the fire, Ms. DeStefano held a home insurance policy issued by Kentucky Farm Bureau, and following the government's arson investigation, the insurance company sought to conduct its own inquiry. (*Id.* ¶¶ 36, 43). Kentucky Farm Bureau's arson investigator was Elmer Greene, owner and operator of Greene Light.

2

(*Id.* ¶¶ 18, 43).   According to Mr. Tucker, Kentucky Farm Bureau's relationship with Greene Light and Mr. Greene had begun two years earlier, in 2014, when the two entities came to a "secret agreement" by which Greene Light would work exclusively on Kentucky Farm Bureau fire investigations.  (*Id.* ¶ 17).  Mr. Tucker alleges that Mr. Greene became acquainted with Kentucky Farm Bureau while Mr. Greene was previously employed by Southern Fire Analysis, a company which also conducted arson investigations for Kentucky Farm Bureau.  (*Id.* ¶¶ 11-13).

In the four years after Mr. Greene formed Greene Light, Kentucky Farm Bureau sent Greene Light a number of fire investigations that represented "more than double the total amount of investigations Greene did at Southern Fire" over the same amount of time. (*Id.* ¶ 20).  In Mr. Tucker's words, the arrangement between Kentucky Farm Bureau and Greene Light "meant that for all intents and purposes, that [Greene Light and its employees] were in-house fire investigators for KFB."  (*Id.* ¶ 22).  Due to that relationship, Mr. Tucker alleges that Greene's fire investigations on behalf of Kentucky Farm Bureau were subject to bias and reliability issues, as Greene was purportedly incentivized to make findings that were favorable to the insurance company.  (*Id.* ¶¶ 26-28).

Thus, when Kentucky Farm Bureau investigated the fire at Ms. DeStefano's home, it sent Mr. Greene to do the job.  (*Id.* ¶ 43).  Mr. Greene began the investigation by interviewing Ms. DeStefano in the presence of police officers, who Mr. Greene allegedly invited to attend the interview without Ms. DeStefano's knowledge.  (*Id.* ¶ 44).  After the interview, Mr. Greene performed the investigation in a manner now objected to by Mr. Tucker.  (*E.g., id.*, ¶¶ 45-46).  According to Mr. Tucker, Mr. Greene "claimed to do a 'sift' of the [house's] contents, but he did not[,]" because "Greene was never trained to do a

3

sift and all he did was take whatever he and his untrained help could find in the rubble and lay it on a blanket in the yard." (*Id.* ¶ 46).

From there, Mr. Tucker alleges that Greene Light and Kentucky Farm Bureau manufactured an arson claim against Mr. Tucker and Ms. DeStefano. (*Id.* ¶ 48). More specifically, Mr. Tucker claims that during Greene Light's "sift" of the house's contents, Mr. Greene incorrectly concluded that "there appeared to be too few items in the home," implying that personal property had been removed, and thus that an arson had occurred. (*Id.* ¶¶ 43, 48). Kentucky Farm Bureau used Greene Light's findings to void Ms. DeStefano's home insurance coverage and to support its theory that the fire occurred due to an arson. (*Id.* ¶ 48). Then, KFB had the remains of the house bulldozed, which Mr. Tucker alleges was done "[i]n furtherance of the fraud and to intentionally destroy any problematic evidence[.]" (*Id.* ¶ 49).

Following Kentucky Farm Bureau's determination that Ms. DeStefano and/or Mr. Tucker had committed arson, criminal charges were filed against both, and Mr. Tucker alleges that the indictments were "based in whole or in large part upon KFB and Greene's 'investigation.'" (*Id.* ¶ 61). Furthermore, Mr. Tucker posits that Greene Light and Kentucky Farm Bureau "intentionally misrepresented that Greene was independent from KFB," and that if the police had known about their business relationship, that information would have been given to the prosecutor, and in turn, the prosecutor would have declined to bring the charges[1]. (*Id.* ¶¶ 57, 61). All in all, Mr. Tucker argues that the

---

[1]     Mr. Tucker notes that after the trial, "Sergeant Pittaluga was surprised to learn that Greene exclusively worked for KFB," but otherwise does not specify who Sergeant Pittaluga is or what his or her affiliation is. (Doc. # 18 ¶ 61). The Court nonetheless assumes that Sergeant Pittaluga ia a law enforcement officer involved in the arson charges brought against Mr. Tucker and Ms. DeStefano.

specific details of the alleged collusion between Kentucky Farm Bureau and Greene Light "caused [him] to be charged with arson and then [be] unable to properly and fully defend against the arson charge levied against him." (*Id.* ¶ 63).

Elmer Greene was the government's sole expert witness during the arson trial, and he testified that "scientific evidence" proved Ms. DeStefano's house had burned due to an arson. (*Id.* ¶¶ 51-53). Among the evidence presented by Mr. Greene was the theory that the house had burned due to a "time-delay device" used in combination with an accelerant to start the fire after Mr. Tucker and Ms. DeStefano had left the home to travel to Tennessee. (*Id.* ¶ 55). From there, prosecutors presented evidence of Ms. DeStefano's financial status to establish a motive for the arson, and also relied upon Mr. Greene's "sift" of the house's contents to make the government's case. (*Id.* ¶¶ 59-60). Nonetheless, both Mr. Tucker and Ms. DeStefano were acquitted by a jury on all charges, and after their acquittal, they learned of Mr. Greene's purportedly problematic association with Kentucky Farm Bureau. (*See id.* ¶ 61).

In addition to facts related to his own case, Mr. Tucker has also provided facts related to a non-party known as "Lady X," another Kentucky Farm Bureau insured who the insurance company and Greene allegedly accused of arson after a house fire. (*Id.* ¶ 66). According to Mr. Tucker, Greene and Kentucky Farm Bureau manufactured an arson claim against Lady X after Greene performed a "test" that Mr. Tucker purports to have been pseudoscientific. (*Id.* ¶¶ 75, 78). Unlike Mr. Tucker and Ms. DeStefano, criminal arson charges were not brought against Lady X, as Mr. Tucker purports that the Kentucky State Arson Investigator and other officials were "not impressed with Greene and KFB's junk science[.]" (*Id.* ¶ 78). Despite the state's refusal to get involved, Mr.

Tucker alleges that Kentucky Farm Bureau used Greene's findings "to undermine Lady X's insurance claim, causing her to take less than full value" for the loss of her home.  (*Id.* ¶ 79).

Mr. Tucker filed this lawsuit in September 2021 in Kenton Circuit Court, and Defendants removed the action to this Court in October 2021.  (*See* Doc. # 1).  In his Amended Complaint, Mr. Tucker has asserted the following claims: (1) general violations of RICO under 18 U.S.C. § 1962(c) (Doc. # 18 at 16);  (2) a RICO conspiracy under 18 U.S.C. § 1962(d) (*id.* at 26);  (3) fraudulent misrepresentation under Kentucky law (*id.* at 28);  (4) fraudulent concealment or fraud by omission under Kentucky law (*id.* at 29);  (5) engaging in organized crime under Kentucky law (*id*);  and (6) a civil conspiracy under Kentucky law (*id.* at 30).

As a threshold matter, the Court notes that two Motions to Dismiss were filed before the filing of the Amended Complaint.  (Docs. # 16 and 17).  Those Motions will be **denied as moot**, as they are mooted by the Amended Complaint and the filing of new Motions to Dismiss addressing the Amended Complaint directly.  (Docs. # 19 and 20). Additionally, Mr. Tucker has filed a Motion for Leave to File Excess Pages in anticipation of his Response to the Motions to Dismiss.  (Doc. # 27).  Mr. Tucker has requested permission to file a 32-page Response which addresses both pending Motions, arguing that leave is warranted to allow for him to respond to both motions simultaneously instead of with two separate filings.  (*Id.*).  Seeing that good cause exists for such an extension, the Court will **grant** the Motion for Leave to File Excess Pages (Doc. # 27), and with threshold matters addressed, the Court will proceed to adjudicate the pending Motions to Dismiss the Amended Complaint.

III.    ANALYSIS

The Racketeer Influenced and Corrupt Organizations Act ("RICO") "prohibits certain conduct involving a pattern of racketeering."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006); *see also* 18 U.S.C. § 1962.  RICO is unique, in that unlike the vast majority of federal criminal statutes, it provides a private civil right of action to individuals who are "injured in [their] business or property by reason of a [RICO] violation," in addition to criminal penalties available to the government.  *See, e.g.*, 18 U.S.C. §§ 1963-64.  The law was enacted by Congress as part of the Organized Crime Control Act of 1970.  Pub. L. No. 91-452, 84 Stat. 941.  Congress wrote that the law's purpose was "to seek the eradication of organized crime in the United States by . . . [creating] new remedies to deal with the unlawful activities of those engaged in organized crime."  *Id.* at 923.  More specifically, this Court has previously noted that RICO's original purpose sought to "protect the democratic process from the influence of organized crime," as "money and power derived from organized crime were increasingly being used to infiltrate and corrupt business and labor unions[.]"  *United States v. Bowling*, No. 6:09-CR-16-DCR, 2010 WL 5067698, at *4 (E.D. Ky. Dec. 7, 2010), *aff'd sub nom. United States v. Adams*, 722 F.3d 788, 802 (6th Cir. 2013) (affirming the cited decision and reversing others within the same case).  Underscoring RICO's intent of protecting democratic institutions in *Bowling*, the Court upheld a vote-buying conviction under RICO's criminal

provisions, holding that "vote-buying is among the types of activities that are associated with organized crime and which Congress sought to eradicate through RICO."[2]  *Id.*

With RICO's purpose in mind, the Court has evaluated the pending Motions to Dismiss and has determined that the injuries alleged by Mr. Tucker are not the types of injuries contemplated by RICO, and as such, he lacks standing.  While both Defendants have premised their Motions to Dismiss on Federal Rule of Civil Procedure 12(b)(6), which provides for dismissal of an action for failure to state a claim upon which relief can be granted, (*see* Docs. # 19-1 and 20), Defendants have also raised the issue of standing as part of those arguments.  (*E.g.*, Doc. # 19-1 at 14) ("The RICO claims must be dismissed because plaintiff lacks standing to assert a claim for damages.").

Standing is usually an issue of subject-matter jurisdiction raised in a motion to dismiss brought under Rule 12(b)(1) for lack of jurisdiction.  *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (citing *Allstate Ins. Co. v. Global Med. Billing, Inc.*, 520 F. App'x 409, 410-11 (6th Cir. 2013)).  However, when standing is derived from a statute, instead of from the general standing doctrine taken from Article III of the Constitution, the analysis differs.  *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011).  Statutory standing, unlike Article III standing, is "a matter of statutory construction, not jurisdiction," as "[t]he question is closely related to the merits inquiry (oftentimes overlapping it)[.]"  *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998)).  In the context of this case, the Sixth Circuit has clarified that RICO standing is squarely an issue of statutory

---

[2]    Even though *Bowling* deals with a criminal conviction, whereas a civil RICO claim is in question here, both the criminal and civil provisions in the statute provide causes of action for any violations of § 1962, which defines prohibited activities under RICO.  *Compare* 18 U.S.C. § 1963 *with* 18 U.S.C. § 1964 (both referencing 18 U.S.C. § 1962).  Thus, *Bowling*'s analysis of RICO's purposes and the types of prohibited activities contemplated by the law are equally as applicable in this civil RICO action.

standing. *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 563 n.2 (6th Cir. 2013) (en banc), *cert. denied*, 572 U.S. 1100 (2014). When a plaintiff has not sufficiently pled statutory standing, "her claim should be dismissed for failure to state a claim upon which relief can be granted" under Rule 12(b)(6). *Roberts*, 655 F.3d at 581. Thus, as an issue of statutory standing, civil RICO standing "is sufficiently intertwined with the merits" to be considered as part of a 12(b)(6) motion to dismiss for failure to state a claim, and is evaluated by the 12(b)(6) standard of review. *Stooksbury v. Ross*, 528 F. App'x 547, 555 (6th Cir. 2013). Accordingly, Defendants' raising of standing within a 12(b)(6) motion is appropriate in this civil RICO action.

### A.     Standard of Review

In evaluating a 12(b)(6) motion to dismiss, a court is called to assess whether the plaintiff has "state[d] a claim to relief that is *plausible* on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (emphasis added). In making that assessment, a court should accept the plaintiff's allegations as true, and then determine whether the plaintiff has pled sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "if the plaintiffs do 'not nudge their claims across the line from conceivable to plausible, their complaint must be dismissed.'" *Jackson*, 731 F.3d at 562 (quoting *Twombly*, 550 U.S. at 570) (cleaned up).

To give rise to plausibility, the complaint must contain factual allegations that speak to all of a claim's material elements "under some viable legal theory." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In short, a claim cannot survive a motion to dismiss if the plaintiff has not pleaded sufficiently plausible facts to

support a "viable legal theory" with respect to all material elements of each claim.  *See id.*
Here, because the Court is evaluating standing, the same test will be applied to each
requisite element of standing in a civil RICO case, instead of the elements of the
underlying substantive counts.

### B.    RICO Standing

Standing in a civil RICO case requires a plaintiff to show "(1) a violation of [RICO],
(2) an injury to his business or property, and (3) that his injury was proximately caused by
the RICO violation."  *Stooksbury*, 528 F. App'x at 556.  Defendants have raised arguments
related to the first and second elements of RICO standing.  (*See* Doc. # 19-1).  In large
part, their discussion relates to the first element, as they argue that Mr. Tucker has not
adequately pled a violation of RICO in terms of the elements of a substantive RICO claim.
(*See, e.g.*, *id.* at 1-11).  While those arguments on the substantive elements demonstrate
exactly how the standing inquiry is inextricably intertwined with the merits of Mr. Tucker's
claims, Defendants have also directly invoked the second element of RICO standing,
albeit in fewer words.  (*Id.* at 12-13).  In short, Defendants have argued that Mr. Tucker
"has failed to allege that a RICO scheme injured his business [or] property," and after
reviewing the pleadings, the Amended Complaint, and the applicable law, the Court
agrees.[3]

---

[3]    In the absence of the second element, Mr. Tucker has failed altogether to demonstrate
standing, which necessitates dismissal on its own.  Thus, the Court need not address the
substantive elements of the alleged RICO violation, which implicates the underlying merits and
the first element of RICO standing.  *Cf. Stooksbury*, 528 F. App'x at 556-57 (only addressing the
causation prong and upholding a dismissal of the claim in entirety on the same basis).

1.      *Mr. Tucker has not plausibly demonstrated an injury to his business or property.*

As previously stated, RICO's original purpose involved combatting organized crime, especially as it began to affect the democratic process. *Supra* part III.  However, the law has also "long recognized that RICO has evolved 'into something quite different from the original conception of its enactors[.]'" *Jackson*, 731 F.3d at 563 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985)).  When Congress enacted RICO, it used broad, inclusive language, and "directed courts to give the statute a liberal construction." *Id.* (citing Pub. L. 91-452).  Consequently, "courts have frequently rejected arguments that RICO should be given constructions that prevent it from reaching conduct that Congress may not have intended it to reach." *Id.*  However, the Sixth Circuit has simultaneously recognized *en banc* in *Jackson* that "[n]onetheless, RICO's breadth is not boundless," as "[t]he text of the statute imposes genuine limitations." *Id.*

One such limitation is the requirement that a RICO plaintiff be "injured in his business or property" as a prerequisite to filing a civil RICO action.  18 U.S.C. § 1964(c); *see also Stooksbury*, 528 F. App'x at 556.  The *Jackson* court interpreted RICO's "business or property" requirement by analogizing it to a similar requirement in federal antitrust statutes, noting that the Supreme Court has explained "that '[t]he phrase 'business or property' also retains restrictive significance[,] . . . [as] Congress must have intended to exclude some class of injuries by the phrase[,]'" although the statute does not fully require that cognizable injuries must stem *only* from a plaintiff's business activities. 731 F.3d at 564 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339-40 (1979)).

Rather than attempting to delineate what specifically constitutes an injury to one's business or property, though, courts have instead resorted to stating what types of injuries

are *not* covered by RICO.   Accordingly, courts "have uniformly recognized that 'the ordinary meaning of the phrase 'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom.'"   *Id.* (quoting *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988) (collecting cases at note 4).   In other words, injuries that are facially "personal"–stemming from damage to one's person without other monetary harm– are excluded from RICO without further analysis.   *Cf. Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir. 1986) (noting that RICO excludes recovery for personal injuries and does not apply to a wrongful death case).   However, monetary damages usually associated with personal injury cases, such as attorney's fees or lost wages, can be recovered if those damages do not stem from a personal injury.   *Jackson*, 731 F.3d at 565-66.   In other words, the distinction between actionable damages and non-actionable damages in a RICO case depend on "the origin of the underlying injury," and not the type of injury suffered or the cause of the injury itself.   *Id.* at 565.   Thus, damages of any nature in a RICO case must stem from an injury to one's business or property rather than an injury to oneself.   *See also id.* at 565-66 ("[T]he concept is clear: both personal injuries and pecuniary losses flowing from those injuries fail to confer relief under [civil RICO].")

The contexts in which the same types of damages have been both successful and unsuccessful in efforts to confer RICO standing illustrate how the origin of damages remains most instructive to the inquiry.   In *Slorp v. Lerner, Sampson & Rothfuss*, the Sixth Circuit overturned a district court's denial of a plaintiff's motion for leave to amend his complaint, reasoning that attorney's fees were recoverable under RICO because the plaintiff had incurred attorney's fees in defending an allegedly fraudulent scheme to foreclose on the plaintiff's home, and the attorney's fees were thus "intertwined with the

property injury".  587 F. App'x 249, 262-63 (6th Cir. 2014).  Nonetheless, attorney's fees are frequently provided by courts as an example of a type of injury not recoverable under RICO, *e.g., Jackson*, 731 F.3d at 565, and even the dissent in *Jackson* used attorney's fees as an example of typically non-recoverable injuries.  *Id.* at 579 (Moore, J., dissenting).

Lastly, courts within the Sixth Circuit have also noted that when alleged injuries are characteristically recoverable in a state court tort action, those injuries usually arise from a plaintiff's own personal injury, and thus "are not injuries to [a] plaintiff's 'business or property' under the statute.  *Cnty. of Summit v. Purdue Pharma, L.P.* (*In re Nat'l Prescription Opiate Litig.*), No. 1:17-MD-2804, 2018 WL 6628898, at *8 (N.D. Ohio Dec. 19, 2018);  *see also Arnold v. Alphatec Spine, Inc.*, No. 1:13-CV-714, 2014 WL 2896838, at *7 (S.D. Ohio June 26, 2014) (quoting *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992) (en banc)) ("This limitation ensures that RICO is not expanded to provide 'a federal cause of action and treble damages to every tort plaintiff.'").

To begin analyzing Mr. Tucker's allegations of RICO injuries, the Court will begin by extracting the parts of the Amended Complaint that make mention of damages. Unfortunately, Mr. Tucker has spent the majority of his Amended Complaint providing facts about the alleged racketeering scheme between Kentucky Farm Bureau and Greene Light.  (*See generally* Doc. # 18).  But with respect to damages, he has written that the "misconduct caused [him] to be formally charged" with felony arson and insurance fraud in Kentucky state courts.  (*Id.* ¶ 103).  Mr. Tucker alleges that as a result, he was "put in jail for a period of time, had to post bond and engage a competent criminal defense

attorney to fight the spurious charges," incurring $30,000 in criminal defense fees, in addition to "past and future lost wages and a rented residence."  (*Id.* ¶ 104, 106).

Furthermore, Mr. Tucker has pled that he "suffered real monetary and non-monetary harm as a result of Defendants' activity and seeks actual, statutory and punitive damages, civil penalties, attorneys' fees, and costs" (*id.* ¶ 107), but other than being imprisoned, posting bond, retaining an attorney and a vague reference to "past and future wages and a rented residence," Mr. Tucker has not provided information as to what, specifically, his actual damages are.  (*Id.* ¶ 106).  Later, under the RICO conspiracy count, Mr. Tucker writes that "[a]s a direct and proximate result of Defendant's racketeering activities and violations of [RICO}, Plaintiff has been *injured in his business and property*," (emphasis added) but the complaint otherwise does not reference any business or property owned by Mr. Tucker.  (*Id.* ¶ 114).

At the outset of this analysis, the Court notes that to the extent Mr. Tucker has merely pled that he suffered damages, even in language that tracks the RICO statute (*see id.*), those pleadings are facially insufficient.  The law is clear that "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 500 U.S. at 555, and that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" for purposes of surviving a motion to dismiss. *Iqbal*, 556 U.S. at 678 (cleaned up).  Thus, the Court immediately discards Mr. Tucker's bald assertions of damages at Paragraphs 107 and 114, in addition to the references to "past and future wages and a rented residence" at Paragraph 106, as the Amended Complaint otherwise contains no facts related to Mr. Tucker's wages or his residence. (*See* Doc. # 18).  After those exclusions, the Court is left with the allegations that Mr.

Tucker was wrongfully prosecuted, wrongfully imprisoned, and that he was forced to spend money posting bond and on retaining an attorney at Paragraphs 103 and 104.

First, Mr. Tucker's alleged injuries related to a wrongful prosecution and resulting imprisonment are facially personal, as they are entirely non-pecuniary in nature and do not relate to any business or property.  As such, they are not compensable under civil RICO and will be excluded.  *Jackson*, 731 F.3d at 565-66.  Thus, the remaining question is whether Mr. Tucker's alleged pecuniary losses, the money he spent posting bond and on retaining an attorney, are sufficient to confer RICO standing on his claims. Unfortunately for Mr. Tucker, they are not, as those losses stem from personal injuries too attenuated from the alleged RICO scheme he has otherwise pled in detail.

In *Jackson*, the Sixth Circuit wrote that "[t]he reason why these expenses do *not* constitute an injury to property is because a personal injury does not lead to 'a proprietary type of damage.'"  731 F.3d at 565 (quoting *Bankers Tr. Co. v. Rhoades*, 741 F.2d 511, 515 (2d Cir. 1984)).  Here, Mr. Tucker has suffered no proprietary type of damage, as his alleged injuries, even liberally construed, stem entirely from damages *he alone* suffered, without any impact to a business or property.  While Mr. Tucker is correct that "incurred fees in prior litigation . . . proximately caused by conduct that would qualify as a RICO predicate act," he has only cited out-of-circuit cases in support of that proposition, and an examination of the only available Sixth Circuit case on that issue makes clear that the facts in that case do not align with the facts here.

As previously stated, the plaintiff in *Slorp* was permitted to plead an injury of incurred attorney's fees in a civil RICO case because he incurred those fees defending a wrongful attempt to foreclose on his home, which the court called a "quintessential

property injur[y]."  587 F. App'x at 263.  The Sixth Circuit reasoned in that case that the plaintiff "suffered an injury to his home as a result of the defendants' alleged scheme[,]" and "the attorney's fees he incurred were pecuniary losses intertwined with the property injury and therefore are recoverable under [civil RICO]."  *Id.*  Here, Mr. Tucker suffered no such injury to property.  He instead incurred costs based on an alleged injury only to his self.

While Mr. Tucker may posit that the wrongful prosecution was caused by alleged RICO violations related to property loss—namely, Kentucky Farm Bureau's denial of Ms. DeStefano's insurance claim based on an allegedly fabricated arson allegation, such a position is not supported by the law.  As previously stated, *Jackson* makes clear that the line between actionable and non-actionable injuries in a RICO case depends on "the origin of the property [loss]" alleged, and not the cause of the loss itself.  731 F.3d at 569.  The *Jackson* plaintiffs were Michigan workers' compensation claimants who alleged that they had been fraudulently denied benefits after suffering injuries at work, and the court held that in spite of legal entitlement to workers' compensation benefits, their claims were not actionable under RICO because the money damages that the plaintiffs sought were to compensate them for their personal injuries and originated in those personal injuries.  *Id.*  In making its reasoning clear, the court wrote that "even though the plaintiffs have no cause of action under the theory we advance today, a welfare recipient could hypothetically file a RICO action based on fraudulent devaluation of welfare benefits, because that injury is not a "personal injury."  *Id.* at 569.  Put differently, the hypothetical plaintiffs could have proceeded because the damages would have originated in a property interest they held: their entitlement to worker's compensation benefits, while the *Jackson*

16

plaintiffs' claims originated in their own injuries. Here, the damages sought by Mr. Tucker—money he spent in defending a criminal prosecution—originated entirely in losses suffered only by Mr. Tucker, and not any property or business owned by him, and not in any property interest he held or expected to hold.  The insurance policy at issue, the home at issue, and the property interests at issue in this case were all owned by Ms. DeStefano, who is not a party to this action.  (*See* Doc. # 18 at ¶ 5).  Thus, the losses incurred by Mr. Tucker in defending the prosecution stem entirely from his own personal injury, meaning they are not actionable under civil RICO.

Otherwise, to the extent that Mr. Tucker attempts to plead additional damages in his Response to the Motions to Dismiss (Doc. # 28), those attempts are futile, as the Court "may not consider matters beyond the complaint" in deciding a motion to dismiss. *Kostrzewa v. City of Troy*, 247 F.3d 633, 643 (6th Cir. 2001) (internal citations omitted). Lastly, Mr. Tucker's argument that there are additional damages "not specifically listed in the First Amended Complaint" is equally futile.  In response, the Court simply notes that specifically listing information in the complaint is unfortunately the name of the entire game when it comes to Rule 8 and thereafter surviving a 12(b)(6) motion to dismiss.

## IV.    CONCLUSION

While the Racketeer Influenced and Corrupt Organizations Act is a self-expansive statute, it does not operate without limitations, and in the Sixth Circuit, the law requires that a plaintiff's injuries stem from an injury to business or property to confer standing. *Jackson*, 731 F.3d at 565-66.  When a plaintiff's losses "are not different from the losses the plaintiff[] would experience if [he] had to bring a civil action to redress [his] personal injuries," those losses do not confer RICO standing.  *Id.*  In the absence of standing, a

plaintiff's claims cannot succeed, and thus, the Court must grant the pending Motions to Dismiss the Amended Complaint.  (Docs. # 17 and 18).  After dismissal of the RICO claims, the Court lacks subject-matter jurisdiction to consider the remaining state law claims, and thus, the Amended Complaint will be dismissed entirely.

Accordingly, **IT IS ORDERED** that:

(1)    Kentucky Farm Bureau's initial Motion to Dismiss (Doc. # 16) is **DENIED AS MOOT**;

(2)    Greene Light and Mr. Greene's initial Motion to Dismiss (Doc. # 17) is **DENIED AS MOOT**;

(3)    Kentucky Farm Bureau's Motion to Dismiss the Amended Complaint (Doc. # 19) is **GRANTED**;

(4)    Greene Light and Mr. Greene's Motion to Dismiss the Amended Complaint (Doc. # 20) is **GRANTED**;

(5)    Mr. Tucker's Motion for Leave to File Excess Pages (Doc. # 27) is **GRANTED**;

(6)    Mr. Tucker's Amended Complaint (Doc. # 18) is **DISMISSED WITH PREJUDICE** and this action is **STRICKEN** from the Court's active docket; and

(7)    An accompanying **Judgment** is filed contemporaneously herewith.

This 27th day of September, 2022.



Signed By:
_David L. Bunning_
**United States District Judge**

K:\DATA\ORDERS\Cov2021\21-131 MOO re MTD.docx